UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| BLUE CROSS AND BLUE SHIELD OF ALABAMA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CVS HEALTH CORPORATION and CVS PHARMACY, INC.,<br><br>Defendants. | ) | C.A. No. 20-236 WES<br><br>**FILED UNDER SEAL** |
| HORIZON HEALTHCARE SERVICES, INC. (d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY); and HORIZON HEALTHCARE OF NEW JERSEY, INC. (d/b/a HORIZON NJ HEALTH),<br><br>Plaintiffs,<br><br>v.<br><br>CVS HEALTH CORPORATION and CVS PHARMACY, INC.,<br><br>Defendants. | ) | C.A. No. 20-458 WES<br><br>**FILED UNDER SEAL** |
| HIGHMARK INC.; HIGHMARK BCBSD INC.; HIGHMARK WEST VIRGINIA INC.; and HIGHMARK WESTERN AND NORTHEASTERN NEW YORK INC. (d/b/a BLUECROSS BLUESHIELD OF WESTERN NEW YORK and BLUESHIELD OF NORTHEASTERN NEW YORK),<br><br>Plaintiffs,<br><br>v.<br><br>CVS PHARMACY, INC., | ) | C.A. No. 20-507 WES<br><br>**FILED UNDER SEAL** |

Defendant.

CAPITAL BLUECROSS,

Plaintiff,

v.

CVS HEALTH CORPORATION and CVS PHARMACY, INC.,

Defendants.

C.A. No. 20-520 WES

**FILED UNDER SEAL**

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, District Judge.

Across these four cases, health care plans accuse CVS of fraudulent conduct causing them to overpay for prescription drugs. They say, through the Health Savings Pass ("HSP") and the Value Prescription Savings Card ("VPSC") programs, CVS dishonestly charged amounts over what is called the usual and customary ("U&C") price. U&C is the governing metric, and its definitions are at the heart of these cases: Plaintiffs say the definitions included these discount programs, and CVS disagrees. CVS moves to dismiss all four cases;[1] but for the reasons set forth below, the Court determines that most of Plaintiffs' claims survive.

[1] These cases and corresponding motions are: C.A. No. 20-236 (BCBS of Alabama), ECF No. 26; C.A. No. 20-458 (Horizon), ECF No. 17; C.A. No. 20-507 (Highmark), ECF No. 20; C.A. No. 20-520 (Capital), ECF No. 19.

All docket numbers refer to C.A. No. 20-236, unless otherwise noted. This Order resolves the four pending motions, which are similar in all material respects, except as highlighted.

I. BACKGROUND

Plaintiffs' members bought generic prescription drugs from CVS using their insurance; this dispute concerns the amounts Plaintiffs paid for the drugs. Compl. ¶ 39, ECF No. 1. The basic logistics of these dealings are: each Plaintiff contracts with one or more Pharmacy Benefit Manager ("PBM"), which, in turn, contracts with CVS (the PBMs serve as "middlemen" between Plaintiffs and CVS). Id. at ¶¶ 8, 51-52, 56. These contracts include bargained-for prices Plaintiffs must pay when their members make a qualifying drug purchase. Id. at ¶¶ 52, 56. If, however, the U&C price – defined generally in these contracts consistently with the National Council for Prescription Drug Programs (NCPDP) definition to mean the cash price available to the public – is less than the bargained-for price, then Plaintiffs need only pay the lesser amount. Id. at ¶¶ 46, 53-56.

Starting in 2008, CVS invited customers to join its HSP program, through which CVS offered participants (and, Plaintiffs emphasize, "[a]nyone could join") discounts on certain generic drugs for a small annual fee. Id. at ¶¶ 71-72. But CVS did not report its HSP price as the U&C price, even though Plaintiffs say it fit the (general) definition as "the most common price charged to cash customers." Id. at ¶¶ 76-78. When CVS eventually terminated the HSP program, it "effectively converted" the program

into the ScriptSave[2]-created VPSC program, "automatically enroll[ing]" HSP members into that program (though CVS offered members an opt-out). Id. at ¶¶ 94-96 (describing "partnership" between ScriptSave and CVS). And, Plaintiffs say, although this "successor program" offered the public discounted prices as well, CVS did not report those prices as its U&C prices, either. Id. at ¶¶ 78, 97. On cue, Plaintiffs sued, alleging fraud, fraudulent concealment, negligent misrepresentation, unjust enrichment, and a host of state-specific claims, each of which CVS challenges now.

## II. LEGAL STANDARD

Claims sounding in fraud are subject to a Rule 9(b) analysis. Although less forgiving than Rule 8, Rule 9(b) still "does not demand a blow-by-blow account." Foisie v. Worcester Polytechnic Inst., 967 F.3d 27, 50 (1st Cir. 2020) (requiring that the plaintiff plead "the who, what, where, and when of the alleged fraudulent conduct"). Rule 8 alone sets the bar for Plaintiffs' other claims, requiring, at this stage, a plausible claim to relief. See Abdisamad v. City of Lewiston, 960 F.3d 56, 59 (1st Cir. 2020). Construing the complaint in the light most favorable to the plaintiff, see Negron-Gaztambide v. Hernandez-Torres, 35 F.3d 25, 27 (1st Cir. 1994), the Court takes all well-pleaded allegations as true while giving the pleader the benefit of all

---

[2] ScriptSave's formal name is Medical Security Card Company, LLC, d/b/a ScriptSave. Compl. ¶ 84, ECF No. 1.

reasonable inferences, see Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 18 (1st Cir. 2002).

III. DISCUSSION

CVS moves for dismissal on seven grounds, addressed, in seriatim, below.

A. False Statement

First, CVS says the relevant definitions of U&C, the ones derived from the CVS-PBM contracts, are fatally absent from the Complaints. And it submits that Plaintiffs omitted them for good reason – because the prices charged through the HSP and VPSC programs do not meet the U&C definitions in those contracts. Mem. of Law in Supp. of Mot. to Dismiss ("Mot. to Dismiss") 12-14, ECF No. 25-1.

But Plaintiffs do allege that CVS, in configuring the U&C prices, intentionally deviated from the operative contracts and industry standard. Compl. ¶¶ 5 ("CVS was required by governing contracts, and industry standards, to submit the same low price it offered to the general public who paid 'cash' . . . By intentionally submitting falsely inflated U&C prices, CVS knew that it was being overpaid for these generic drug transactions."), 8. The industry standard — as translated by the NCPDP — defines U&C as the "[a]mount charged cash paying customers for the prescription exclusive of sales tax or other amounts claimed." Id. at ¶ 50; see also id. at ¶¶ 8 (alleging that the U&C price is

"the price offered to a member of the general public paying for a prescription drug without insurance"), 46. Plaintiffs have plausibly pleaded, with particularity, that CVS should have included these programs under any relevant definition. The exclusion of the specific CVS-PBM U&C definitions from the Complaints is not dispositive of whether the prices fit those definitions.

CVS asks too much at this stage. See BCBSM, Inc. v. Walgreen Co., No. 20 C 1853, 2021 WL 77233, at *5 (N.D. Ill. Jan. 8, 2021) (rejecting equivalent dismissal argument, despite Rule 9(b) particularity requirement (citing Sheet Metal Workers Local No. 20 Welfare & Benefit Fund v. CVS Health Corp., 221 F. Supp. 3d 227, 231 (D.R.I. 2016); Corcoran v. CVS Health Corp., 169 F. Supp. 3d 970, 986 (N.D. Cal. 2016))); Blue Cross & Blue Shield of N. Carolina v. Rite Aid Corp., No. 20-CV-1731 (ECT/KMM), 2021 WL 465323, at *9-10 (D. Minn. Feb. 9, 2021) (holding that the plaintiffs pleaded a plausible fraud claim with sufficient particularity). Its arguments really quarrel about the merits and are better left for later.

B. Scienter

Second, and relatedly, CVS argues that the Complaints lack allegations reflecting scienter (that is, that CVS knew or believed the cash discount prices were the U&C price), but this fails as well.

Plaintiffs allege that the programs themselves were a means to a fraudulent end: that, for example, the HSP program, with its "negligible membership requirements," was a "ruse" that CVS "devised" to avoid reporting unprofitable U&C prices. Compl. ¶¶ 4, 14-16, 73; see also id. at ¶ 18 (alleging that, following the termination of the HSP program, CVS carried on these practices through the VPSC program). They plead that CVS understood HSP to be a cash discount program and so it should've reported those prices as U&C prices under the relevant contracts, "[b]ut CVS intentionally decided not to do so." Id. at ¶ 15; see also id. at ¶¶ 12 (pleading that "CVS knew" the cash discounted price was the true U&C price (emphasis added)), 16 ("CVS intentionally concealed this scheme for years."), 64 (referencing internal CVS documents showing that CVS monitored competitor discount programs and "strategiz[ed] about whether the competitors were reporting those discount prices as the U&C prices"). No more is required at the pleading stage. See Rodi v. S. New England Sch. of L., 389 F.3d 5, 15 (1st Cir. 2004) (for fraud at the pleading stage, "intent and knowledge[] may be averred in general terms" (citing Fed. R. Civ. P. 9(b))).

C. VPSC Program Theories

Third, CVS challenges Plaintiffs' allegations related to ScriptSave's VPSC program, mainly arguing that ScriptSave's discount prices are simply not CVS's U&C prices. But Plaintiffs'

theory is that CVS, in partnership with ScriptSave, used this program to continue its fraudulent scheme. Compl. ¶¶ 85-87, 95-97. When CVS eventually terminated the HSP program, it transferred members into the VPSC program (unless they opted out). Id. at ¶¶ 18, 95-96 (alleging the HSP program and the VPSC program "functioned similarly . . . and served the same purpose"). Plaintiffs plead that CVS used the VPSC program to keep reporting fictional U&C prices; to advance this theory, they point to internal documents they say reflect CVS and ScriptSave's joint effort to protect the prices (discussed first for the HSP program). See id. at ¶¶ 85-97.

As the cases progress and the standards intensify, Plaintiffs will need to prove these allegations, and Plaintiffs may well fall short. But at this early stage, this theory, plausibly pleaded with the requisite particularity, survives.

D. Fraudulent Concealment

Fourth, CVS seeks dismissal of Plaintiffs' fraudulent concealment[3] counts, claiming that the law imposes no duty to disclose the information Plaintiffs allege CVS withheld. This information includes: accurate, non-inflated U&C prices, Compl. ¶ 132; CVS's internal understanding that the discount programs

[3] Plaintiffs vacillate between referring to these claims as fraudulent concealment and fraudulent omission. See Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss 5, 29, ECF No. 33.

involved cash pricing, were part of CVS's cash business, and otherwise qualified as U&C prices, id. at ¶ 133; the number of customers paying the discount program prices, the drugs discounted by the programs, and the prices at which CVS offered the discounted drugs to its cash customers, id. at ¶ 134; and "that it frequently offered the same cash prices to customers" outside the programs as it did to customers in the programs, id. at ¶ 135. Divulging this information, Plaintiffs say, was "necessary to correct the misleading information that CVS reported for claims for payment . . . [,] namely, the inflated U&C prices." Id. at ¶ 136.

The pertinent question is whether CVS owed Plaintiffs this information at all. See MilitaryHomeLink.com, LLC v. Hunt Cos., No. CV 18-011 WES, 2018 WL 4100502, at *3 (D.R.I. Aug. 28, 2018) ("A fraudulent-non-disclosure claim requires a duty to disclose."). An entity may have a duty to disclose if it provides "partial information that may be misleading." See V.S.H. Realty, Inc. v. Texaco, Inc., 757 F.2d 411, 414 (1st Cir. 1985).

As the allegations go, CVS strategized internally to conceal the programs' true effects on pricing, all the while publicly presenting these programs in a way that rendered the U&C pricing misleading. See, e.g., Compl. ¶¶ 16, 133-136. In obscuring its true understanding of these programs, CVS listed misleading prices that it then had a duty to correct. Id. at ¶¶ 103, 121, 127, 136; see also Walgreen, 2021 WL 77233, at *9 (analyzing Illinois law,

and holding that "[a]t this stage, [the p]laintiffs' allegations that Walgreens' repeated submissions of false U&C prices in its forms (which Walgreens asserted as true and accurate) when actually charging customers less could give rise to a duty to disclose").

Thus, having offered these alleged half-truths, CVS had a duty to fill in the gaps. See V.S.H. Realty, 757 F.2d at 414-15 (holding that, under Massachusetts law (in accord with the Restatement (Second) of Torts), "partial and ambiguous statements," amounting to "fragmentary disclosures," sufficiently stated a misrepresentation claim); see also Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 2000 (2016) (in a False Claims Act case, recognizing half-truths as "representations that state the truth only so far as it goes, while omitting critical qualifying information"); Skochin v. Genworth Life Ins. Co., 413 F. Supp. 3d 473, 486 (E.D. Va. 2019) (reciting definition of "a half-truth as '[a] statement that is only partly true, made [usually] to mislead or to keep something secret' or '[a] statement that mixes truth with falsity in order to confuse or deceive'" (quoting Half-Truth, Black's Law Dictionary (11th ed. 2019))).[4,5]

---

[4] To the Court's mind, this theory may betray Plaintiffs' true theory of the case: that CVS reported patently false prices (and not half-true ones). But Rule 8 allows for alternative theories, regardless of consistency. See Fed. R. Civ. P. 8(d)(3).

[5] Having concluded that the half-truth theory sustains Plaintiffs' allegations, the Court need not address Plaintiffs'

E. CVS Health Corporation

Fifth, CVS asks the Court to dismiss CVS Health Corporation because the Complaints lack specificity as to what wrongful acts CVS Health Corporation committed.[6] But Plaintiffs' allegations that CVS Health was involved in decisions related to these programs, see Compl. ¶ 94, is enough to keep it in the case, at least for now. See Walgreen, 2021 WL 77233, at *7 (rejecting argument that the defendants were improperly "lumped together[,]" noting that the defendants were not individuals, but rather "a company and its parent corporation"); see also Compl. ¶ 30 (alleging parent-subsidiary relationship).

F. New Jersey Consumer Fraud Act

Sixth, CVS moves to dismiss Plaintiff Horizon's claim brought under the New Jersey Consumer Fraud Act[7] because, under that law, a third-party payor does not qualify as a "consumer." And CVS cites plenty of law to support this claim. See, e.g., Cent. Reg'l Emps. Ben. Fund v. Cephalon, Inc., No. CIV.A. 09-3418 MLC, 2009 WL 3245485, at *3 (D.N.J. Oct. 7, 2009) (holding that "third-party

---

alternative argument that an asymmetry of information actualized a duty to disclose.

[6] This argument concerns only three of the Complaints, excepting Highmark, C.A. No. 20-507.

[7] CVS argues that this "conditional" claim is improper, but that argument ignores the appropriateness of alternative pleading. See Fed. R. Civ. P. 8(d)(2).

payors . . . are not 'consumers'" under the statute); MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC, No. 3:18-CV-2211-BRM-LHG, 2019 WL 1418129, at *18 (D.N.J. Mar. 29, 2019) (same); In re Schering-Plough Corp. Intron/Temodar Consumer Class Action, No. 2:06-CV-5774(SRC), 2009 WL 2043604, at *31-32 (D.N.J. July 10, 2009) (carefully analyzing J & R Ice Cream Corp. v. Cal. Smoothie Licensing Corp., 31 F.3d 1259, 1273-74 (3d Cir. 1994), and finding same); In re Rezulin Prod. Liab. Litig., 392 F. Supp. 2d 597, 616-17 (S.D.N.Y. 2005) (same); S. Ill. Laborers' & Emps. Health & Welfare Fund v. Pfizer Inc., No. 08 CV 5175KMW, 2009 WL 3151807, at *9 n.18, *10 (S.D.N.Y. Sept. 30, 2009) (same, and recognizing that the "weight of New Jersey authority supports" this result).

Courts in New Jersey are "not in uniform agreement" on this issue, Rezulin, 392 F. Supp. 2d at 616, and Horizon cites a New Jersey trial court holding that third-party payors can qualify as consumers. Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., No. ATL-L-3015-04, 2004 WL 3767338, at *4-6 (N.J. Super. Ct. Law Div. July 8, 2004); see also Int'l Union of Operating Engineers Loc. No. 68 Welfare Fund v. Merck & Co., 929 A.2d 1076, 1079 n.1 (N.J. 2007) (in reviewing the case on appeal, presuming that to be true). Given the opportunity, most courts have declined to follow the Merck decision. See, e.g., Rezulin, 392 F. Supp. 2d at 616-17 & n.109. This Court follows suit, siding instead with the federal authority analyzing this issue in

accordance with most New Jersey courts.[8,9] As pleaded, Plaintiff Horizon was not a "consumer" in the transactions, and Count VII in C.A. No. 20-458 is therefore dismissed.[10]

G. NY General Business Law Section 349

And last, CVS argues that the Highmark Plaintiffs' claim under Section 349 of New York's General Business Law fails, too, because the at-issue conduct, between businesses, was not consumer-oriented.[11] See Rezulin, 392 F. Supp. 2d at 614. The Second Circuit summarized the "critical question" as "whether the matter affects the public interest in New York." Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995) (affirming jury verdict on Section 349 claim between commercial competitors where "the harm to the public" was manifest because appellant made misrepresentations to regulatory agencies).

---

[8] The Second Circuit's Desiano v. Warner-Lambert Co., 326 F.3d 339, 348-51 (2d Cir. 2003), analyzing proximate cause, does not counsel otherwise.

[9] In Sheet Metal Workers, this Court distinguished the transactions in Rezulin and Schering-Plough from those before it. Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Health Corp., 221 F. Supp. 3d 227, 233 (D.R.I. 2016). But, as recognized there, New Jersey's consumer protection law differs from the one before the Court then (Indiana's). Id.

[10] Leave to amend this claim would be futile.

[11] For the same reason given in note 7, supra, Plaintiffs properly plead this claim.

CVS is right that, as pleaded, it made these misrepresentations to Plaintiffs (and not to consumers), a fact that some courts in certain contexts have found dispositive. See Rezulin, 392 F. Supp. 2d at 614 (recognizing that drug manufacturer's conduct, which was intended to increase consumption of drug, had sizeable economic consequences but holding that the Section 349 claim failed because the representations were not intended for the ultimate consumers); see also Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP, 20 F. Supp. 3d 305, 334 (E.D.N.Y. 2014), aff'd, 806 F.3d 71 (2d Cir. 2015) (recognizing material distinction between misrepresentations made exclusively to PBMs and "marketing scheme aimed at the consuming public").

But Plaintiffs need only plead allegations "demonstrat[ing] that the acts or practices have a broader impact on consumers at large[,]" Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 25 (1995), and they've done so here, see, e.g., Highmark Compl. ¶ 11, ECF No. 1, C.A. No. 20-507 (alleging the at-issue provision "ensures that Plaintiffs (and their insureds) do not pay more for a given generic drug than a" cash customer), 119 (alleging that CVS "prevented Plaintiffs from obtaining more favorable prescription drug prices for their members"). Because Plaintiffs plausibly pleaded that CVS's conduct affected the consuming public, see Oswego Laborers', 85

N.Y.2d at 25; see also Walgreen, 2021 WL 77233, at *11, *13 (endorsing similar argument, relying on allegations like those pleaded here), Highmark's Section 349 claim clears this hurdle.

IV. CONCLUSION

For those reasons, ECF Nos. 26 (BCBS of Alabama), 20 (Highmark), and 19 (Capital), are DENIED, and ECF No. 17 (Horizon) is GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED.

William E. Smith
District Judge
Date: July 6, 2021